STATE of Maine

v.

Woodbury E. ELDRIDGE.

Supreme Judicial Court of Maine.

March 31, 1975.

David Q. Whittier, County Atty., South Paris, for plaintiff.

Ray R. Pallas, Westbrook, for defendant.

Before DUFRESNE, C. J., and WEATHERBEE, POMEROY, WERNICK, ARCHIBALD, and DELAHANTY, JJ.

WEATHERBEE, Justice.

The Defendant was convicted by an Oxford County jury of the offense of breaking, entering and larceny in the nighttime. He appealed from the judgment which was entered upon this conviction. [1]

We deny the appeal.

The indictment upon which the Defendant was convicted charged that he broke and entered in the nighttime the store of W. F. Eastman in Porter and stole from Mr. Eastman 27 Jonsereds chain saws, 3 Tilton chain saws and 9 Frontier chain saws. The serial numbers of these saws were alleged specifically.

At trial, Mr. Eastman described his business operation as being one in which he both repairs chain saws and sells them at retail. When he closed his shop at 5 o'clock the afternoon of February 6, 1974, he had a large number of chain saws, both used and new, some on display and some of the new ones still unpacked. When he left the building that night all of the doors were locked and the window over his work bench was closed and covered with a wire mesh. When he returned at 8 o'clock the next morning, the window was open and the wire mesh which secured it had been cut and folded back. There was a pile of snow on his work bench and all his new saws—39 in number—were gone.

■ Two days later the Defendant was found to be in possession of a large number of new Jonsereds chain saws which he was offering for sale at a fraction of their retail value. A number of these saws came into the hands of the police a short time later. At trial, the State selected four of these to be marked and introduced as exhibits (the others were referred to as being "in the backroom") and they were identified by Mr. Eastman as having been in his store the night of February 6 and missing when he came to the store in the morning of February 7. As the State relied upon the principle that possession of recently stolen goods creates an inference of guilt not only of larceny but of breaking and entering as well when larceny is part of the greater crime, proof that at least one of these four chain saws *was* property stolen from Mr. Eastman and *was* property later found in the possession of the Defendant was critical to the State's case. The sufficiency of that proof is determinative of this appeal.

Mr. Eastman testified that when chain saws were received in his shop, the serial number of each was taken from the invoice and listed in a record book. He produced an invoice for one of the four saws to demonstrate this. When a saw was sold, a record of sale card was prepared also containing the serial number. Each night Mr. and Mrs. Eastman checked off the saws sold against those received and, he said, "every night we go through the records and we know what we have sold and we know what we have got left." The saws on hand are recorded nightly in his inventory sheet. He said that he had checked these records and that they showed that each one of these four saws was among those stolen from him that night. He did not produce the records of which he spoke. He said the retail value of these four saws was $325.00, $179.00, $285.00, and $285.00 respectively.

A Mr. Emery testified that an acquaintance named Nason informed him that there would soon be chain saws available. A few days later, Mr. Nason's wife phoned and told Mr. Emery that the saws were

---

1. One Gary Creamer had also been indicted for the same offense and the Court ordered that Mr. Creamer and Mr. Eldridge be tried jointly. There was no objection by the Defendants. At the conclusion of the testimony, the presiding Justice ordered a judgment of acquittal in the charge against Mr. Creamer.

available now. Mr. Nason lived in one half of a duplex in Portland. The Defendant occupied the other half. When Mr. Emery arrived at Mrs. Nason's home on February 9, the lady left, went next door, and returned with the Defendant. After a discussion, the Defendant took Mr. Emery to the Defendant's half of the duplex where Mr. Emery saw "about 30" Jonsereds chain saws on the living room floor, some still in their boxes. The Defendant permitted Mr. Emery to take one saw away to show a prospective buyer. When he returned, the Defendant sold him 8 saws for $75.00 each. At this time, Gary Creamer was present in the Defendant's home.[2] Later, the Defendant phoned Mr. Emery and told him that he had better hide the saws because "they were looking for them."

Mr. Emery identified State's Exhibit 3, a Jonsereds, as one of the eight saws which he purchased from the Defendant which he later turned over to an officer of the State police. He described it as having been "brand new" when be bought it from the Defendant for $75.00.

A Mr. Theriault testified that on February 9 he received a phone call from the Defendant asking if he "was interested in a chain saw." He went to the Defendant's home where he saw at least twenty chain saws. The witness, apparently cautious and knowledgeable in such transactions, inquired "if they were from around here." The Defendant answered that "the tags were on the box." The tag on the box bore the name of Mr. Eastman. Mr. Theriault purchased twenty saws from the Defendant at an agreed price of $55.00 each. Mr. Theriault needed time to arrange the financing. As he was leaving, Mr. Theriault noted that Gary Creamer was entering the Defendant's house. The next day Gary Creamer called upon the witness and collected the purchase price.

Mr. Theriault sold these saws and then, after some contact with the Maine State Police, he "went around and bought them back."

An officer of the Maine State Police, Trooper Lombard, testified that during his investigation of this matter, Mr. Emery turned over to him eight chain saws and Mr. Theriault surrendered twenty chain saws to him. The serial numbers of some of these had been removed but the four which were introduced as exhibits still bore serial numbers.

The officer had made a list of the serial numbers of the saws that were returned to him by Mr. Theriault. At trial he was asked if he could identify the four saws which had been introduced as exhibits. Although the Defendant has contended that the officer was unable to identify any of the four saws entered as exhibits as having been among those turned over to him by either Mr. Theriault or Mr. Emery, our study of the record leads us to the opposite conclusion. The officer consulted his list of saws recovered from Mr. Theriault and answered that State's Exhibits 1 and 4 came from *"the other subject."* (Emphasis added.) On cross-examination, he was again asked, this time by serial number, and he answered that none of the four came from *Mr. Theriault.* These questions and answers followed:

"Q How about that [Exhibit 2], is that on the list [the list of saws he received from Theriault]?

A No. I think these saws came from another subject.

Q I can't hear you.

A No, these are the saws, I believe, that came from Mr. Emery.

Q Mr. Emery?

A Yes. The other saws are out in the back room."

2. The jury could attach significance to this fact as Mr. Eastman had testified that two strangers—one a man whom he identified as Gary Creamer—had visited Mr. Eastman's shop on February 6 and had spent ten or fifteen minutes looking at his chain saws.

We are satisfied that the jury could reasonably interpret the officer's testimony to the effect that he received twenty saws from Mr. Theriault and eight from Mr. Emery and that those which were not on the Theriault list came from Emery. The Defendant did not testify and presented no witnesses in his behalf.

We must now analyze the sufficiency of the evidence to meet the three specific attacks upon the conviction which the Defendant now makes on appeal. They are:

"I. The trial court erred in denying the motion for judgment of acquittal based on the failure of the State to establish either the ownership or possession of any of the items introduced into evidence at trial.

II. The trial court erred in denying the motion for judgment of acquittal based upon the lack of continuity of the evidence.

III. The trial court erred in denying the motion for judgment of acquittal based upon the failure of the State to relate the appellant to the crime charged in the indictment save for allowing the jury to predicate one inference upon another."

■ We agree with the Defendant that the State, having chosen to allege the theft of 39 saws described by serial number must offer satisfactory proof that one or more of these *particular* saws was stolen. Mr. Eastman's testimony offered no such proof as to any but the four which were admitted as exhibits.

■ Mr. Eastman testified that he learned from examining the invoices (of chain saws which he had received) and the daily records (which he had kept of his daily sales) that he had 39 particular new saws in his shop when he closed February 6 and that they were all missing the next morning. Four of the missing saws, he said, were State's Exhibits 1, 2, 3 and 4. Although he said he had the invoices for these saws at trial, he was not requested to present them for examination. He did not, however, bring to Court the records he said he had made of his sales and daily inventory, but the defense did not choose (probably for tactical reasons) to request that he obtain them. The absence of these later records may have detracted somewhat from the probative weight of his assertions, but the probative weight to be given to this testimony was for the jury.

The jury had other substantial proof. The jury could properly draw the inference from Mr. Emery's testimony that word had gone out from the Defendant through the Nasons that the Defendant would soon have stolen chain saws available at bargain rates and, later, that a stock was now on hand. It was certainly clear to the jury from Mr. Theriault's testimony that he had received, by clear implication, the same notice. When Mr. Theriault, who lived in Gorham, in Cumberland County, saw the large number of saws in the Defendant's Portland living room, he inquired cautiously, if they came "from around here." The jury doubtless interpreted the Defendant's answer as one intended to assure Mr. Theriault that they were stolen from an area (Porter in Oxford County) sufficiently distant to permit them to be disposed of safely.

The jurors could properly conclude from these facts, the prices for which they were sold, from Mr. Creamer's involvement in one sale three days after he was seen examining the saws at the Eastman shop, that the saws in the Defendant's living room were at least part of the 39 stolen from Mr. Eastman.

But had the particular four which were introduced into evidence been stolen from Mr. Eastman? Again, the jury could consider the manner in which the Defendant replied to Mr. Theriault's query whether the saws in the Defendant's living room came "from around here" and consider the Defendant's answer that the tags were on the box as indicating that they were *all* from the Eastman shop.

In addition to this, the jury heard Officer Lombard's testimony when he examined the four exhibits and checked their serial numbers against the serial numbers on the list he had made of twenty saws turned over to him by Mr. Theriault, and also heard his answer that the saws had come from "the other subject" and " . . . [t]hese are the saws, I believe, that came from Mr. Emery." Mr. Emery had said that the saws he surrendered to the officer came from the Defendant.

Also, Mr. Emery examined these four saws and he recognized Exhibit 3 as being one of those which he had bought from the Defendant and had surrendered to Officer Lombard. While he also said—disagreeing with the officer—that numbers 1, 2 and 4 were not among those he had turned over to Officer Lombard, he was apparently making his identification from gross appearances and not from serial number.

The testimony as to the particular four exhibits having been among the 39 new chain saws stolen from Mr. Eastman is not without obvious imperfections. The same is true as to the testimony concerning the proof of continuity of the four exhibits. Officer Lombard testified that twenty saws had been returned to him by Mr. Theriault and that he had checked the numbers against Mr. Eastman's list and that every one of them that still had serial numbers matched those on Mr. Eastman's list. He then had taken the saws to his residence and locked them there in an overhead area. His testimony as to the eight saws which he said Mr. Emery returned to him was less precise. All those which still had serial numbers matched the numbers on Mr. Eastman's list. He was not asked in what manner he had kept them nor was it ascertained where they had been from the time of Mr. Emery's acquisition until the un-disclosed date when Mr. Emery turned them over to him.[3]

The purpose of requiring proof of continuity of possession of an object offered as an exhibit is to insure the identify of the object and its freedom from tampering or alteration which would affect its probative value.[4] Here, the probative value of the chain saws did not depend upon an unchanged operating condition, for example, but only upon their identity which was proved by make, model, external appearance, and serial number and there was nothing to suggest that absence of evidence of continuity made such proof unreliable. State v. Mosher, Me., 270 A.2d 451, 453 (1970).

Again, we are not considering these aspects of the trial from the standpoint of admissibility of evidence but, instead, as to the sufficiency of the evidence to support a jury's conclusion that at least one of the chain saws entered as exhibits was stolen from Mr. Eastman's shop and found in the Defendant's possession. As we have frequently said, the credibility of the witnesses and the probative value of the evidence are matters for jury determination. We have no doubt that the jury could properly be satisifed that the Defendant's possession of at least one of Mr. Eastman's stolen saws had been proved.

We have frequently described the circumstances under which unexplained possession of recently stolen property may entitle a jury to draw an inference of guilt of larceny (State v. Gove, Me., 289 A.2d 679 (1972); State v. Collamore, Me., 287 A.2d 123 (1972); State v. Poulin, Me., 277 A.2d 493 (1971)) and of breaking and entering as well, when larceny is a part of the greater crime. State v. Saba, 139 Me. 153, 27 A.2d 813 (1942). Applying the

---

3. The record shows that Officer Lombard arrested Mr. Emery on February 27 for the offense of knowingly being in possession of stolen property, to which he pleaded guilty.

4. See State v. Lafferty, Me., 309 A.2d 647, 657–658 (1973) (rejecting the argument that an insignificant break ("missing link") in the chain of custody of certain physical evidence (blood samples in *Lafferty*) makes the evidence per se inadmissible).

principles explained in those decisions, we have no hesitation in saying that the jurors were justified in drawing the inference of guilt, as they did.

The entry will be:

Appeal denied.

All Justices concurring.