STATE of Maine

v.

Ronald W. BEY.

Supreme Judicial Court of Maine.

July 3, 1975.

Donald H. Marden, County Atty., Augusta, for plaintiff.

Sanborn, Moreshead & Schade by Peter T. Dawson, Augusta, for defendant.

Before DUFRESNE, C. J., and WEATHERBEE, POMEROY, WERNICK, ARCHIBALD and DELAHANTY, JJ.

WEATHERBEE, Justice.

A Kennebec County jury found defendant guilty of grand larceny of a considerable quantity of lumber and plywood. There is no doubt but that his conviction rested upon an inference of guilt drawn from his possession, some 26 days after the theft, of similar quantities of similar lumber and plywood, thirteen pieces of which were determined by witnesses to be the identical pieces which had been stolen from the victim. Thus, the reliability of identification of this lumber as that which had been stolen is critical to the determination of this appeal and it and the several other specific issues raised on appeal require a detailed examination of the facts presented.

We deny defendant's appeal.

A Mr. Sharpe had contracted to build a home in Augusta for a Mr. Garside and on June 7, 1972, lumber for this construction was delivered to the site. It included 103 pieces of 2″ x 6″ x 16′, 58 pieces of 2″ x 4″ x 8′, 60 pieces of 2″ x 4″ x 16′, 350 pieces of 2″ x 4″ x 8′, 120 sheets of 4′ x 8′ x ½″ exterior grade plywood. Some of the 2 x 4s were stamped with the manufacturer's mark "SASI ALIB". On June 8 a carpenter cut about 100 of the 2″ x 4″ x 8′ pieces down to 7′ 7″ lengths for future use as a vertical studding. He left the discarded 5″ lengths scattered on the ground.

When Mr. Garside returned to the site the next morning, he found that the 2 x 4s, the 2 x 6s and the ½ inch plywood had disappeared. Investigation by the police produced no clue to the location of the missing lumber.

Mr. Garside and Mr. Sharpe placed a notice in the Daily Kennebec Journal requesting information concerning the stolen property and Mr. Garside received an anonymous telephone call directing him to a site in Chelsea, some five miles distant, where the defendant was starting to build a home for himself and had excavated a cellar, which was partially walled with concrete blocks.

Mr. Garside went to this site on July 5 and he found a considerable amount of lumber, covered by a translucent plastic covering, piled in the cellar excavation. Later that day, he, along with two police officers, examined it more closely and found that it consisted of many 2 x 4s, 2 x 6s, and sheets of ½ inch exterior grade plywood in what appeared to be about the same total quantity as that which had been stolen from him. He measured several of the 2 x 4s on the top of the pile and found that they were 7′ 7″ long. They also had been stamped with the words "SASI ALIB" as some of his stolen lumber had been.

A search warrant issued, based upon Mr. Garside's affidavit recounting these facts, and the police returned to the cellar. The defendant confronted them there and ordered them off his property. The defendant said he had a cancelled check to prove his title to the lumber. A few minutes later he said he had bought it from a truck driver. The police seized 118 sheets of 4′ x 8′ x ½″ plywood, 53 pieces of 2″ x 6″ in lengths of 14′ and 16′, 363 pieces of 2″ x 4″ in lengths of 14′, 16′, 8′ and 7′ 7″.

Although the record does not disclose *how many* of the 2 x 4s seized had been cut to a length of 7′ 7″, the officers seizing it testified that two pieces of 7′ 7″ length were then "matched up" with 5″ pieces which had been sawed off Mr. Garside's 8′ lengths at Mr. Garside's site. By comparing the grains and discolorations of the long and short pieces of wood, noticeable split marks, and knots and planer marks that had been cut across, it could be seen, when the ends of a long and a short piece were held together, that these distinguish-

ing marks matched and demonstrated that these two short pieces had been sawed off the two long pieces. The officers then seized all the lumber and took it to the City Highway Garage where they were examined and eleven more pairs of long and short pieces were also found to possess severed imperfections or distinguishing marks by which they were matched in the same manner.

The local police then took two of these matching pairs of 7′ 7″ and 5″ sections to the State Police laboratory where a qualified State Police technician examined them and determined, from the flow of the grain, several imperfections, cracks, bisected knots and manufacturer's tool marks, and the matching surfaces of the butt ends, that the two short pieces had been cut from the two long pieces. Photographs illustrating the technician's testimony were admitted for the jury's examination.

The defendant's appeal presents us with several issues.

*The Instructions of the Presiding Justice*

The defendant contends that the presiding Justice erred in instructing the jury that

"You have the right to infer as a fact a person having recent *or remote* exclusive possession or control, joined with others,

of stolen goods is a thief." (Emphasis added.)

■ This statement, the defendant argues, erroneously suggests to the jury that such an inference might in this case be drawn from *remote* possession. He raises this issue for the first time on appeal. No objection was made to the instruction when given and therefore we examine the defendant's belated claim only to determine whether the defendant has satisfied us that there was error so seriously prejudicial as to tend to produce manifest injustice.[1]

■ We find that the defendant has taken the Justice's instruction out of context. The fairness of a Justice's charge must be determined by a review of the charge in its entirety and not from isolated phrases. *State v. Hudson,* Me., 325 A.2d 56, 66 (1974). In fact, the Justice uses the word "remote" not to condone the inference of theft from *remote* possession, but in the sense of "less recent", or to suggest "degrees of recentness" which the jurors might consider in their determination as to appropriateness of the inference.[2]

In the case before us, the facts suggest that the building materials were discovered missing on June 9 and that similar materials (later seized) were discovered in the defendant's foundation on July 5, so that the period during which the materials were

1. *State v. McKeough,* Me., 300 A.2d 755 (1973) ; M.R.Crim.P., Rule 30(b).

2. The Justice said, in part:
"Now, this inference you may draw is not conclusive, and it may be stronger or weaker as the possession of the stolen property, if you find there was possession, is *more or less recent.* By 'recent', I mean closer to time of the date it was proved to have been stolen. The inference, as you view all the evidence, may be stronger or weaker as the time *is recent or more remote.*

. . . . . .

"You may consider the interval of time from the time of the theft to when you find it was on the property and in the possession and under the control of Mr. Bey, on all the evidence. Was the interval so short as to

render it very certain, or was the time such that intermediate things do happen which would explain the possession short of you inferring that he must have stolen it? You may consider all those things. Was the possession recent? Was it a week, was it a month, was it two weeks—in the light of all the evidence? You have heard it all. You have heard the testimony of when they found it there. You have heard testimony of other witnesses. Was, in fact, this same lumber there before it was found, or was it not? All of those things are for you.
"So, in this conclusion as to that, so as you view the evidence, the inference may be greater, lesser, or stronger, or increase or decrease, according to the recentness or remoteness of the time as you find the possession to have been." (Emphasis added.)

missing was something under four weeks. Defendant cites two recent Maine cases and one case from the Federal Court of_ Appeals in the District of Columbia to hold that the inferential conclusion that the possessor of stolen property is also the thief must be based on *recent* possession, not *remote* possession. *State v. James,* Me., 312 A.2d 531 (1973); *State v. Gove,* Me., 289 A.2d 679 (1972); *Pendergrast v. United States,* 135 U.S.App.D.C. 20, 416 F.2d 776 (1969).

In *James,* the period intervening between loss of items and rediscovery of them in the defendant's possession was 33 days. In both *James* and *Gove,* we approved of language from the Appendix to *Pendergrast*:

> "The word 'recently', as used in these instructions, is a relative term, and it has no fixed meaning. . . . The longer the period of time since the theft of the property, the more doubtful becomes the inference which may reasonably be drawn from its unexplained or unsatisfactorily explained possession." 416 F. 2d at 790–791.

Taken as a whole, the Justice's instruction as to this issue correctly informed the jury and no manifest error is evident.

The defendant also raises for the first time an alleged error in the presiding Justice's instruction defining larceny:

> "I'll give you some other instruction as to particular rules applying to larceny, *meaning possession of stolen goods,* when I go through this." (Emphasis added.)

Once again, we find that the defendant takes this sentence of the instructions out of context. One page earlier in the record the instructions include a verbatim reading of pertinent parts of the larceny statute (17 M.R.S.A. § 2101), and, on the page from which the defendant abstracts the alleged error and on subsequent pages, the presiding Justice gives a correct detailed explanation of the elements of larceny, including a definition of the legal meaning of steal, taking, carrying away property of another, intent to permanently deprive, the absence of lawful right or reason, and the identification of the accused as the person who committed the offense. The Justice then went on to explain the circumstances under which an inference may be drawn from the possession of stolen property.

We are not satisfied that the obviously inadvertent use of the language complained of tended to confuse the jury to the defendant's prejudice.

*Admission of Affidavit*

After discovering the lumber in the partially completed cellar in Chelsea, Mr. Garside executed an affidavit which formed part of the basis for the issuance of the search warrant. It recited the quantities and dimensions of the lumber which he believed to have been stolen from him and it recited his telephone conversation with the unidentified person which led him to the Chelsea cellar.

This affidavit was admitted into evidence by agreement and later, after arguments and charge and after the jury had retired to complete its deliberations (presumably with the affidavit), the defendant's counsel sought to limit the use of the affidavit by the jury to matters which would not include the *substance* of the phone call. The Justice denied the motion.

As to this, the affidavit had recited:

> "The person who called would not identify himself, but asked me if I was missing any lumber, I told him that I was and I asked him who he was, he would not tell me who he was but *did tell me that he knew where my lumber was located.* The caller informed me [here followed detailed directions to the defendant's site]. He told me that the lumber was located inside that cellar . . . ." (Emphasis added.)

The hearsay aspect of this telephone conversation was recognized by both coun-

sel and Court early in Mr. Garside's direct testimony when, on being asked why he went to the Chelsea lot, he answered:

"Well, without relating conversation, the only reason I went there was because I had been previously—I had a phone call that told me where my lumber was."

On the defendant's motion, the Justice ordered the jury to disregard "what someone may have told him" and to consider only that "he went out there as a result of a phone call."

It was apparent from the very beginning of trial that identification of the lumber found in Chelsea as that previously stolen in Augusta was critical to the State's charge against the defendant. During cross-examination of Mr. Garside by defendant's counsel, counsel sought to weaken the credibility of Mr. Garside's identification of the lumber as being the same lumber stolen from him. For obvious tactical reasons counsel had the affidavit marked as a defendant's exhibit and then questioned Mr. Garside concerning its recitation of quantities and dimensions.

Later, for the same obvious purposes, he sought to establish that the telephone call —and not any *actual recognition* of the lumber—was the true basis of Mr. Garside's identification. Defendant's counsel asked:

"And your testimony, I think, was that the caller told you over the phone as to where your lumber was located, or something to that effect?"

And again, on re-cross of this witness, counsel for the defendant asked:

"Mr. Garside, isn't it fair to say that the reason that you concluded that the lumber you saw out there at the foundation was your lumber was because of what this person had told you . . . .?"

The witness responded:

"I would think that perhaps part of the reason I thought it was mine was that I had a tip on it . . . ."

At the conclusion of the State's case the State again offered the exhibit and defendant's counsel said that the defendant joined in the request that it be admitted. It was admitted.

■ After the jury had retired to commence deliberations, the defendant moved that the Justice limit the jury's use of the affidavit to whatever bearing it had on the "amount of lumber originally reported missing", to show an inconsistent statement bearing on identification. The Justice pointed out that the affidavit had been admitted, by agreement, without any restriction as to its use, and he denied the defendant's request. The issue is whether this denial was an abuse of judicial discretion. We hold that it was not. The affidavit had been admitted by agreement without any limitation on its use by the jury and presumably counsel's arguments had been structured with its significance in mind. It lay within the discretion of the Justice to balance the equities and decide whether there existed a possible prejudice to the defendant so great as to require a departure from the usual and orderly procedure of placing limitation upon the use of an exhibit at the time the exhibit is admitted.

Defendant's counsel expressed concern that the affidavit's recital that the anonymous informer had told Mr. Garside where *his* lumber was might be taken by the jury to have probative value as to the identity of the lumber.

It is true, of course, that the presiding Justice could have instructed the jury that the affidavit's recitation that the anonymous caller had referred to the lumber as being Mr. Garside's lumber should not be given weight bearing on the question of whether it was in fact Mr. Garside's lumber. However, the defense had already chosen twice, for strategic reasons, to bring out from Mr. Garside in cross-examination that the caller had spoken of it as Mr. Garside's lumber, accepting whatever advantages this disclosure had brought the

defense. Furthermore, there was additional evidence, to be discussed later, which must have carried great probative value, to the effect that at least some of this lumber certainly was Mr. Garside's. With all this in mind, we are satisfied that there was no abuse of discretion.

### Prosecutorial Comment

The defendant testified that he did not steal the lumber. He said he purchased 126 sheets of plywood, about 65 2 x 6s and about 220 16' 2 x 4s from an Alcide Beaulieu of Augusta the last of May. (Later, he said he received 275 2 x 4s.) He said he had obtained this material at Mr. Beaulieu's warehouse, without any understanding as to unit cost or the total value of the material he had taken. He said he gave Mr. Beaulieu $450.00 in cash as partial payment and that a final accounting would be arrived at later. "We were to figure it out because I had done some work for him." He produced an informal receipt for $450.00 which he said was signed by Mr. Beaulieu.

The defendant also said that he had seen Robert Ifill on the street with a load of 2 x 4s in his truck and that Mr. Ifill gave him about "75 to 100" 2 x 4s. They were stamped "SASI ALIB." [3]

Neither Mr. Beaulieu or Robert Ifill appeared to testify but Robert Ifill's brother testified that he was with Robert about the middle or last of June when Robert found 15 or 20 pieces of 2 x 4 appearing to be about 8' long at the City dump and loaded them into his truck.

During argument, the County Attorney said:

"Notice that Robert Ifill, the man who acquired this property from the dump,

and the man who allegedly gave this to Mr. Bey, did not testify. Isn't he the person best in the position to know exactly where he got this property—"

The defense objected to the comment [4] and the presiding Justice ruled

"I think it may stand. You may argue the same point."

██ The Justice's terse comment summarized the situation correctly. While the defendant had no duty, as such, to call a particular witness, his unexplained failure to present a witness who, if his defense is genuine, might be expected to corroborate that defense, is generally, at least, within the area of proper jury consideration. Similarly, the fact that the State has not called the witness who would be expected to support the State's claim of a defendant's untruthfulness is equally subject to proper comment. Except under circumstances of bad faith concerning the witness's absence or peculiar circumstances of unfairness, whether an inference can be drawn from the fact is usually an area of proper comment.

There was no abuse of discretion by the Justice.

### Sufficiency of the Evidence Supporting the Drawing of an Inference of Guilt from the Possession of Recently Stolen Property.

██ The unexplained possession of recently stolen property may properly entitle the jury to infer that the possessor is also the thief. *State v. Gove, supra.* The evidence that *some* of the lumber found in the defendant's possession had recently

---

3. It seems undisputed that this is a particular manufacturer's mark and lumber so marked is available through many suppliers in New England.

4. A similar comment was later made, without objection, to the fact that Mr. Beaulieu

was not presented as a witness by the defense. The defendant urges us that the Justice's failure to remove this comment also from jury consideration was manifest error. It presents the same issue as the comment concerning Mr. Ifill.

been stolen from Mr. Garside[5] was of such a nature that there can be no question but that the jurors were entitled to accept it as proof of this aspect of the long-accepted principle, if they rejected the defendant's explanation of his acquisition of the lumber. In addition to the testimony previously discussed concerning defendant's claim of obtaining the lumber, the jury had heard the testimony of Mr. Harrington who lived 100′ from the defendant's building site who said that he had noticed a small pile of lumber on the defendant's site around the middle of May and that perhaps 5, 6 or 7 weeks before the seizure by the police a larger pile had appeared there. The jurors had also heard the testimony of the investigating officers to the effect that the defendant had first insisted that he had a cancelled check with which he had purchased the lumber and later had said he got it from a truck driver. The defendant denied making either of these statements.

The issue was largely one of credibility and the jury was entitled to resolve it in the State's favor.

*Sufficiency of the Evidence to Support a Verdict of Grand—as Distinguished from Petty—Larceny*

 The jury found the defendant guilty of grand larceny—that is, larceny of property of a value of more than $500.00.[6]

The jury could have found that 13 of the 7′ 7″ 2 x 4s had been individually identified as being among those stolen from Mr. Garside by distinguishing marks and characteristics. Our question then becomes this: Was there a "confluence of circumstances sufficiently compelling" to sustain a conclusion that at least the greater part of the plywood, 2 x 4s and 2 x 6s had also been stolen from Mr. Garside? *State v. Bickford*, Me., 308 A.2d 561, 565 (1973).

*See also State v. Lizotte*, Me., 230 A.2d 414 (1967). We must marshall for our examination such circumstances as are presented by the record.

Mr. Garside's lumber was stolen June 9. A small pile of lumber appeared at the defendant's site around the middle of May and a larger pile was seen to be present at a later time which the neighbor said was perhaps 5, 6 or 7 weeks before the police arrived on July 7.

Outside of some used staging planks, the lumber at defendant's site consisted of plywood, 2 x 4s and 2 x 6s—as did the lumber stolen. The jury could find that Mr. Garside had lost 120 sheets of ½″ plywood and that 118 sheets of similar plywood were found five miles away on defendant's excavation. Mr. Garside lost 410 pieces of 2 x 4 and there were 363 pieces of 2 x 4 at the defendant's site. Mr. Garside lost 58 pieces of 2 x 6 in 14′ lengths and 103 pieces in 16′ lengths; a total of 53 pieces of 2 x 6 in 14 and 16 foot lengths were found at defendant's site. While the quantities of each dimension were not identical, the jury could find probative value in the similarity. Some of Mr. Garside's 2 x 4s bore a certain manufacturer's stamp—so did some of the 2 x 4s at defendant's site. Some 100 of Mr. Garside's 2 x 4s had been cut down to 7′ 7″—an undisclosed number of 7′ 7″ lengths were found mixed in with other lumber in defendant's pile and 13 of these bore distinguishing marks and blemishes which had been severed, permitting them to be matched with similar marks and blemishes on the 5″ ends which had been sawed off Mr. Garside's 2 x 4s. The jury could also have accepted the police officer's testimony that on the day they seized the lumber the defendant had first told them he had a cancelled check to prove his title to the lumber—which the defendant denied at trial—and that he had later said

5. Here, we refer to the long pieces of 2 x 4 which were "matched up" with the short pieces which had been sawed off at Mr. Garside's site.

6. 17 M.R.S.A. § 2101.

he got it from a truck driver—an explanation which the jury was entitled to consider inconsistent with his trial explanation. The jurors were entitled to consider the defendant's explanation of his obtaining the lumber from Mr. Beaulieu and Mr. Ifill to be implausible and unconvincing.

The difficulty in recognizing a particular piece of wood as one's own—in the absence of distinguishing markings—is obvious. It is no doubt largely true that to an observer, as one witness said, "Spruce is spruce and fir is fir. . . ." However, an owner's inability to recognize each piece as his own does not preclude the jurors concluding that the circumstances surrounding the victim's loss of multiple units of property and the accused's possession of similar multiple units, some of them identifiable, satisfy them beyond a reasonable doubt that the other unidentifiable units were also stolen from the victim.

The Supreme Court of Kansas considered a somewhat similar situation in *State v. Callabresi*, 135 Kan. 463, 11 P.2d 725 (1932). The defendant was proved to have been in possession of several truckloads of red wheat which was similar to and which he claimed to have come from the red wheat in his brother's granary. Mixed in with the red wheat was a small quantity of white wheat. The jury could have found from testimony and observation that the grains of white wheat had come from the victim's granary where a small quantity had become mixed with the victim's otherwise unidentifiable red wheat. The defendant gave explanations of the presence of the white grains which were inconsistent with other testimony. The defendant was convicted of grand larceny and the Supreme Court rejected the defendant's claim that, at most, he had been proved guilty of only petty larceny, holding that the jury could properly find that the white grains identified the entire mass as stolen property.

In our own case the lumber seized from the defendant by the police was proved to have a value of more than $500.00. The Justice carefully and correctly instructed the jury concerning proof of identity of stolen property and as to the special problem involved when only part of the units claimed to have been stolen can be identified. We conclude from the circumstances we have discussed that the jury could be satisfied beyond a reasonable doubt that not only the 13 identified pieces but also, by inference, the entire mass of lumber was the stolen property of Mr. Garside and that the defendant was the thief.

The entry must be:

Appeal denied.

All Justices concurring.